I'm sorry, Mr. Saunders v. Harsco. Harsco. Neither one of them get a Blue Ribbon. Go. May I proceed, Your Honor? Good morning. Jeffrey Gallagher of the law firm Ham Gallagher, Las Vegas, Nevada, for the Plaintiff and Appellant Stephen Saunders, counsel. May it please the Court. At issue is the District Court's dismissal of my client's claim against the defendant Harsco for serious personal injuries sustained as a result of a collision between a locomotive and a water truck on June 11, 2002. We're familiar with the facts. Is the basic dividing line issue here whether Mr. Saunders has to proceed as an employee through workers' comp or some former workers' comp, or whether he's permitted to bring a tort action against persons who might or might not be responsible for his injuries? That's right. Is that the rub? That's right, Your Honor. The question is whether or not Harsco is considered under Nevada law as a statutory co-employee or a statutory employer of Mr. Saunders and would therefore be insulated from suit under the Nevada Industrial Insurance Act. Yeah, in which case Saunders would have to proceed through for remedies through workers' comp. That's correct, Your Honor, although those remedies would not be against Harsco because Harsco has not provided any workers' compensation coverage. The threshold issue and the issue that was ---- He'd go against his employer, which was the other subcontractor. Wilson Creek, that's right, Your Honor. Wilson Creek, thank you. The basic rule is in Nevada you cannot sue your employer for an injury sustained as part ---- as an industrial injury sustained on the job in the course and scope of your employment, but you can sue third parties who cause injuries, even if those injuries are received while you're within the course and scope of your employment on the job. The threshold issue that the district court ignored in this case is the determination of whether or not any of the parties in this case are licensed under the Nevada Revised Statute, Chapter 624. What's the consequence if they're not? If you're ---- Or for the issues in this appeal. Your Honor, if you're not licensed under Chapter 624, there is no automatic immunity under the NIIA. Instead, the ---- Richard's analysis, right? Well, I'm grateful for the Richard's opinion, Your Honor, that came out after we rebriefed this case because I do believe that the opinion parallels my client's brief. However, I believe it doesn't represent a change in the law. And, in fact, the law that was active at the time of this hearing was that if there's no Chapter 624 license, then you do have to apply the normal work test that was first enunciated in Mears in 1985. And there's no question here but that the district court did not engage in that analysis, correct? There is no question, Your Honor. And that question would be whether rail grinding is normally performed by Union Pacific. Well, sir, I believe it has to be done on both sides because, in this case, unlike in the Mears case, we don't have a party who is a normal employee. We have ---- Well, a Mears test has to be engaged in. Let's put it that way. It does, Your Honor, with respect to rail grinding, but also with respect to firefighting. And the reason I believe that is significant in this case is because there is evidence on the record, provided by Mr. Haley, a Harris Coast retained expert, that, in fact, firefighting activities are not the normal work of Union Pacific, but rather, in his words, are typically delegated to the rail grinding. So if the expert says it's typically delegated to the rail grinding, that means it's not normally done by Union Pacific. And, therefore ----  What evidence is this, Your Honor? There is an affidavit provided by Allen Haley, who was retained by Harris Coast. He swore an affidavit that was attached. Which is where? It appears, with the Court's indulgence, at a couple places within the excerpt of the record. Do you have the excerpt of the record? I do, Your Honor. I have both sets, Your Honor. Just checking. I wasn't sure whether it was a Nevada thing or what. Your Honor, it appears both in the supplemental excerpt provided by Harris Coast as well as in my own. And I've ---- Just give me a page on one of those. Well, that's what I'm looking for, Judge. Where you're looking, this would have been submitted to the district court in what? It was submitted to the district court, and it was raised at both ---- No, no. I assume it was in the excerpt. I meant how was it submitted and attached to what pleading? It was attached to, I believe it was attached to my client's motion for reconsideration and also to Harris Coast's opposition to my client's original motion for a summary judgment. I believe it was also attached to Harris Coast's originally denied motion for a summary judgment that was denied on procedural grounds. I see. Well, why couldn't Harris Coast be considered the principal contractor? They ---- didn't they supervise and coordinate the work here of your people? Well, first, Your Honor, the principal contractor distinction now under Richards is really not that important. But to answer your question, a principal contractor needs to hire subcontractors. In this case, Wilson Creek, Mr. Saunders's employer, was not a subcontractor of Harris Coast. You were hired by Union Pacific. Wilson Creek was hired by Union Pacific, yes. Yeah, yeah. Okay. As was Harris Coast. One thing that baffled me here, both parties assume, and that's all right with me, that Nevada law applies here. But the whole thing happened and the work was scheduled to be in Utah. Is there any reason why you gentlemen chose to both say Nevada applies? Your Honor, I filed the lawsuit in state court in Nevada. It was removed. I believe that Nevada law does apply because Mr. Saunders was a Nevada resident, a Nevada employee. Wilson Creek is a Nevada employer and is subject to Nevada industrial insurance law. Harris Coast, of course, invoked Nevada law when they sought to be declared immune under the Nevada industrial insurance act. Oh, okay. So everyone's happy with Nevada so far? Okay. So far, Judge. All right. That's all. If you're happy, I'm happy. And I apologize, Your Honor. I looked at it this morning and now, of course, under pressure I can't find the actual Well, maybe you can come up with it when you sit down. And if I could, I'd like to reserve my final minute, Your Honor. And at that time I'd be happy to present it. So in your view, if the affidavit says what it says it says, and if it was submitted to district court at the proper time, your view would be that that would establish that firefighting is not an activity that derails or engages them on a regular basis. Is that your position? That's accurate, Your Honor. And I believe that under that, with that evidence, the district court should have decided on a partial motion. Well, you can't blame the district court too much because, of course, the opinion Richardson. Thank you. Richardson didn't come down until after you guys were here and, in fact, completed your briefing here. That's correct, Your Honor. I didn't intend to blame Judge Mahan. I simply meant to indicate that with that evidence, it's my opinion or my belief that he could not only or should have not only denied Hartsfield's motion but, in fact, should have granted my client's motion and found that the case should proceed because clearly it's undisputed that firefighting is an activity not normally undertaken by Union Pacific. And the way you construe Richardson is both subcontractors have to be engaged in activities normally engaged by the contractor in order for them to be statutory co-employees. Not specific to Richards, Your Honor, but the way I interpret Nevada law is in order to be co-employees, they each have to independently be an employee. And so in order to determine if you don't have a standard employee relationship where, you know, you withhold money and you pay my taxes, you pay payroll taxes, you have to make that determination on both legs because if you don't, you can't have co-employees if they're not both, in fact, employees. Okay. You've got about a minute. Do you want to say this? I do, Your Honor. Okay. We'll hear from the opposing counsel. May it please the Court. Thomas N. Charchit for Defendant in Appellee High School. Your Honor, the reference to Mr. Haley's affidavit, at least it's in the supplemental excerpt, is that page 44? Page 44. Page 44. I'm sorry. Followed by 24 or 44? 44. 44. Yeah. Followed by a copy of his expert report. That clearly states that this is not something ordinarily done by Union Pacific, doesn't it? I don't, Your Honor. Well, alleges it. Let's put it this way. There's nothing in the record to the contrary. That's true. Well, doesn't that make you a nonstatutory employee because no one here had a license from Nevada as a contractor? But the problem with that, Your Honor, nobody — that's a true statement. Nobody was licensed under the State of Nevada. The question is — And the only thing in the record is that Union Pacific doesn't do this work on a regular basis, and there's nothing to the contrary disputing that. See, I disagree with that observation, Your Honor. Was it a correct observation? If you look — Excuse me. Did I correctly state the record? Well, I have a different interpretation of the record. All right. What's your interpretation? My interpretation of the record is this. If you look at Mr. Haley's expert declaration as having 33 years' experience with the railroads, oversaw grinding, maintenance operations, if you look at the nature of what track grinding is — and I have to say, during the course of preparing for this, I discovered this tome that's entitled, The Art and Science of Rail Grinding. Probably not on the bestseller list, but in that, it gives a historical perspective of how the railroad industry and rail grinding are involved. It just seems to me that it's common sense as central to the core of the business that, of course, the railroad does maintenance and does grinding. Now, grinding has evolved over time, if you look at this. Well, you know — But the record — We do — you know, we have photocopiers in the office, and they have to be maintained. You know? And yet, I don't think that our — the business of our office is photocopying. And it's not photocopying.      And it's copying. It's copying. And it's copying. I'm not a photocopier. Well, Your Honor, now you're — now you're talking about Mears, Central Telephone, and the elevator company. Right. And I would also call the Court's attention, and I did cite it in my brief on the alternative, the so-called public entity test in Virginia, there was another Central Telephone case, and it was called Henderson v. Central Telephone. Now, in that case, Mr. Henderson sued because he was installing some lines or equipment that Centel didn't ordinarily do. So he claimed, to me the same as Saunders here, that there was no exemption under the Mears rule. The Court there did apply a different test, but the facts, it seems to me, illustrate the distinction between Mears and the elevator company and Central Telephone and a function that's critical and central to the business. It's just difficult for me to comprehend, and this is just argument. I thought the test specifically says it doesn't matter how central or critical it is. If it is not normally performed by employees, then the test doesn't apply. I mean, it's a weird — The test — the test, if I may, Your Honor, the test except in cases where the work is obviously a subcontracted fraction of the main contract is whether that indispensable activity is in the business normally carried on by employees. Now, in this case, consider the contractual relationships. The railroad, Union Pacific, hires Harsco. Hires what? Hires Harsco. Harsco. Harsco to do the rail grinding and maintenance. As part of that function, the purpose of the contract, it — Harsco also has to provide adequate fire prevention capability. Tank cars, water cannons, personnel demand those, all of those things. Well, they provide — they also hired Wilson to do that. Later, Your Honor. When they hire Wilson — At the time this job was done, Wilson had been — was a subcontractor of the union. Absolutely. Your Honor, we were hired — we, Harsco, was hired in January of 2001. In February of 2002, that's when Wilson was hired. So what? Well, because the Wilson contract says to support the railroad forces in the track grinding operation. To me, that contractual language has to be given some significance, because at that point, it's Union Pacific and Harsco. And Union Pacific is saying, you, Mr. Wilson Creek, are going to come over here, and you're going to assist Harsco during this high-fire season in Utah in order to minimize fire prevention and problems. And I also, just as an aside, did a request — So what's your point, that Harsco is a supervising — My point is — Excuse me, sir. Listen. I'm sorry. Your point is what, that Harsco is a supervising or coordinating contractor? My point is — Oh, is that your point? Yes or no? No. Then — and Harsco was not — did not have a contract license from Nevada for this job? No, Your Honor, because I guess it was — So what's your point, then? My point is, on the basis of the contractual relationship, when Union Pacific hires Wilson, it is in the same business as Harsco is, and is worried about fire prevention, because Harsco had to do that job. They had people there to do it. They didn't have enough people, at least, or Union Pacific was overly concerned, and as I pointed out in my request for judicial notice of those other cases, fire is a real problem when you're doing rail grinding. They were concerned, so they hired these folks to support — and that's what the contract says — to support the railroad forces. And I would submit, Your Honors, the railroad forces are Union Pacific and Harsco. Now, if — let me ask the — and I know it's the usual question. You're going to ask me a question. That's okay. What if Harsco had hired Wilson Cree, keeping in mind that in Harsco's contract — Well, that's another case. That's not this case. Then they would have been a subcontractor of Harsco. But in this case, the record is that they were a subcontractor of Union. That's correct. Now, has the Court reached a conclusion that Union Pacific and Harsco are not in the same business? We haven't conferenced on this yet, but the seminal question here, I think, before we do anything, is to ask you, all these facts that you're relating, doesn't that add up to the district court should do a Mears test? I would submit that if it did the — I argued any alternative in the brief. I think the conditions here are satisfied for the Mears test. I think that — Well, we don't do factual — we don't make findings here. We deal with law. But if you have facts saying that Wilson is doing something that Union Pacific usually does in their business or some other way, then shouldn't a factual determination be made by a fact finder? Yes. A factual determination should be made. But I would say this. You can't, it seems to me, analyze the case in a vacuum. You can't look at the individual entities. I don't think that's what the law says, because this is a job. The job was the rail track grinding job. But isn't this an argument you should make to a district court, not to an appellate court? I mean, we deal with law — issues of law here. Shouldn't you make that argument to the district court? Yes, Your Honor. And I'm saying that the record is complete enough that I can make the argument and satisfy the condition here. You're saying that you — To satisfy us that fire suppression is something ordinary and usually done by Union Pacific when they're grinding rails. Is that your statement? No, Your Honor. Well, then why should we even listen to it? That's the mere question that's posed for adjudication, isn't it? When — Okay. Don't we have evidence, this affidavit that you helpfully provided a citation to? Doesn't that provide evidence to the contrary? Paragraph 5 says, It is also my personal experience that tasks for fire protection and fire suppression are jobs typically given to contract rail grinding crews such as Haskell. Now, that was your expert, not — that's right. That was your expert, not David Howell's. They're not saying this is a job usually done by our employees, which I thought was a test. The test is quite simple. Is this the kind of thing that usually is done by employees, but in this case they hired a contractor to do it? Or is this a job that's usually done by contractors? If it's done by contractors, then there's no co-employee. But, Your Honors, don't you have to look at the contractual context of the project union? We argue that — Not as I read the cases, but you tell me why I would, should. Well — Since you're so good at rhetorical questions, I, you know — I apologize. Why does it matter? The cases, as I read the Nevada cases, there's only one question, and that is, is this a job usually done by employees of the contractor? Do you disagree with me on that? No. I don't disagree with you on that. Okay. In that case, why did you lose because of this affidavit? Because from my perspective, the case has to be analyzed in the whole. In other words, what was the project involved? I have no idea what you're saying. Look, if the Nevada cases ask a single question, is this the kind of job usually done by — Employees. Employees of the contractor, in this case the railroad. Is that the only thing that matters? Okay. If the answer here is no, this is usually done by contractors, then why isn't that the end of the case for you, and you just have to go and litigate this case as a normal tort case? I don't know what this gestalt, or you've got to look at why any of this stuff matters. If you can find the question to just Union Pacific — I asked you whether that was the question, and you agreed with me that that's the question. I said, I read the Nevada cases as posing a single question, and the single question is, is this usually done by employees? Do you read them differently? And he said no. But I want to look at the gestalt. No, then I misunderstand. Okay, so tell me what the Nevada cases say as you read them. Well, as I read them — And it would be helpful to have citations, you know, actual cases. I have them here, so tell me where it is that you get your — whatever you're going to tell me. The bulk of my argument was related to the Mears test and the Harris case, where the Nevada Supreme Court said there that the relationship between a landowner and a contractor can be more properly characterized as dependent businesses, which are conducting a single business. And my argument — I'm sorry. Where in Harris are you looking? Can you point me to language? I will point you to the language. 197, Nevada, 494-495. Don't mumble. What is the citation? 494-495, 117, Nevada. 206, Nevada, or are you looking at Pacific Reporter? 117, Nevada. Harris versus Rio. Yeah, I have it as either 25 Pacific Reporter — Oh, 25 Pacific Third, roughly 214. I'm getting there. 212, 213, 214. Okay. And what is it that I will find on those pages? Well, in contrast to the two — the relationship of one independent enterprise with another that contracts to perform specialty work is different from the relationship of a property owner with a general contractor that contracts to construct property improvements. And I relate rail grinding to property improvements. In contrast to the two independent enterprises conducting separate businesses, the property owner and the general contractor can more accurately be described as dependent enterprises conducting a single business. They are real property development. Here, track maintenance. I think and I argue that HRSCO and Union Pacific are effectively joined at the hip. And when Union Pacific subsequently goes out to hire Wilson Creek to support the rail forces in putting out fires, effectively, when you look at the entire case, that's because Union Pacific's relationship with HRSCO, they're also in the water business or the fire prevention business. Don't forget, at the end of the day here, by Mr. Saunders' own admission, he was on HRSCO's train manning a water cannon, assisting HRSCO personnel in fire preventing. He was doing exactly what Union Pacific contracted HRSCO and Wilson Creek to do. Yeah, but that's not the Mears test, where he was situated physically at the time he got belted. No, it's not, Your Honor, as I say. Look, take an elevator in this building. Judiciary does not have personnel that maintains elevators. But the elevator comes on and he's not on elevator property. He's on judiciary property. He's not even on judiciary. He's on property owned by the general GSA. Don't remind me. To whom we pay rent. So we're tenants ourselves. So what difference does it make where he was sitting at the time he got hit? What difference could that possibly make in the Mears test analogy? If, and again, if it's about, if you have a, let's take a construction job, and you have 42 subcontractors out there working on the job, I would submit, and let's say they didn't have licenses. Do you, is the Mears test asking each subcontractor whether or not the general does the same thing as each sub? That's the way I read it. Here's this language in Mears at page 1007. The test is not one of whether the subcontractor's activity is useful, necessary, or even absolutely indispensable to the statutory employer's business, since, after all, this could be said practically of any repair, construction, or transportation service. The test, except in cases where the work is obviously a subcontracted fraction of the main contract, is whether that indispensable activity is, in that business, normally carried on through employees rather than independent contractors. Now, you think you fall within that parenthetical, the one that says except in cases where the work is obviously a subcontracted fraction, a subcontracted fraction of the main contract? Well, I think there's an argument that we do. But if you're, again, I will concede that if the question is going to be asked on a subcontractor by subcontractor basis here, Harsco separately, Wilson Creek separately, without regard to the interrelationship that I think the contracts indicate, then Mears would say that Union Pacific per se is not in the fire prevention business. Okay. So that's under the case, isn't it? I don't think so, Your Honor, because I think that when Union Pacific hires Harsco, and part of Harsco's obligation is to do its rail grinding operations in a safe fashion to provide, as it did, cars with water tankers, hose cannons, all foam, all the fire retardants in the world, Harsco is in the fire prevention business and the railroad business. And when Harsco and Union Pacific are working together, and then at some point in time, because Union Pacific is concerned of additional fire danger, they go and hire a subcontractor who is, admittedly, that's all they do. They're firefighters. Okay. But their mission is to assist, support railroads. You're cutting the railroad out altogether. You're saying the contract here, the main contractor is Harsco, and the subcontractor is Wilson Creek. That's what you're saying. Well, they're both subcontractors in a sense. I mean, Union Pacific hired both. If they sign a new subcontractor, they're going to lose. There's no relationship. There's no legal – there's no contract between Harsco and Wilson Creek. That's the problem, isn't it? Okay. Thank you. All right, Your Honor. Thank you. We have something like 40 seconds left. I will use all of them, Your Honor. I'm sorry? I will use all of them. You don't have to use any. I'd like to submit it. Thank you. The case is argued and submitted.
judges: Kozinski, Hawkins, Cowen